ORIGINAL

FILED
DEC 2 3 2015
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TPMC-ENERGYSOLUTIONS ENVIRONMENTAL SERVICES 2008, LLC,<br><br>Plaintiff,<br><br>V.<br><br>DEPARTMENT OF THE ARMY, ARMY CONTRACTING COMMAND-ROCK ISLAND, UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL ACTION NO.: 15-1566 C |

## COMPLAINT

COMES NOW the Plaintiff, TPMC-EnergySolutions Environmental Services 2008, LLC (TES), and appeals a "Claim" to the Defendant based on a "Deemed Denial" of a properly filed and certified claim and Complains of the Defendant, The Department of the Army, as follows:

### I. FACTS

1.

On 9 November, 2010, the Rock Island Contracting Center, Rock Island Arsenal, IL, Department of the Army, awarded Contract No. W52P1J-11-D-0001 to the Plaintiff, TPMC-Energy Solutions Environmental Services 2008, LLC (TES). The contract was described as a three (3) year Indefinite Deliver Indefinite Quantity (IDIQ) contract for remediation services for the free release/decommissioning, and license termination of the Beltsville Agricultural Research Center (BARC) in Beltsville, MD. The contract called for the Army Contracting Command-Rock Island (ACC-RI) to award Task Orders for nine (9) specific tasks detailed in the Performance Work Statement (PWS).

1

2.

The contract incorporated the following pertinent attachments:

    Attachment 0001:    Performance Work Statement (PWS), 17 August, 2009

    Attachment 0003:    Quality Assurance Surveillance Plan (QASP), 12 October, 2015

    Attachment 0004:    Draft Decommissioning Plan, dated July, 2009

    Attachment 0005:    TES's Proposal, dated 11 December, 2009

The contract also stated that the final Decommissioning Plan would be incorporated upon approval from the Nuclear Regulatory Commission (NRC).

3.

The Performance Work Statement (PWS) specified that there would be none (9) different Task Orders (TO) and that "the contractor shall perform all work and the final radiological release survey within the guidelines of the attached Decommissioning Plan (DP)...". They were:

(Task 1) Work Plan: "The (Work Plan) WP shall describe how the contractor plans to perform the specific work described in the draft DP.

(Task 2) Mobilization/Demobilization: "The Contractor shall initiate the process of mobilizing equipment, material, and personnel to the project site NLT one day following the approval of the WP and as authorized by the contracting officer...Conformance to the approved DP, WP and the project schedule shall serve as the basis for measuring task performance."

(Task 3) Site Remediation: "Excavate, and backfill the excavated areas in accordance with the approved DP and WP."...The contractor shall remediate all areas identified in

the decommissioning plan in accordance with the determined site-specific limits."

(Task 4) Site Sampling: "Sample, and segregate contaminated soil, liquids, mixed waste, etc., to facilitate proper packaging and to identify the appropriate disposal option/site in accordance with the approved DO and WP."

(Task 5) Packaging/Staging: "Package, containerize, stage and prepare to transport contaminated soil, liquids, mixed waste, etc., to the appropriate disposal site in accordance with the approved DP and WP."

(Task 6) Transport Contaminated soil, Mixed Waste and LLRW To The Appropriate Treatment/Disposal Facility: "The Contractor shall receive the staged material at the final loading facility, and transport the contaminated material to the appropriate disposal/treatment facility."

(Task 7) Treatment/Disposal: "The contractor shall arrange for all waste streams to be treated/disposed of at the appropriate disposal facility."

(Task 8) Final Status Survey Report (FSSR): "Submit an acceptable FSSR in a timely and efficient manner that conforms to task requirements and applicable standards. All surveys required to prepare the FSSR will be performed during this project pahse."

(Task 9) Human Health Baseline Risk Assessment (BRA): "Conduct limited Human Health Baseline Risk Assessment (BRA)"

4.

Important excerpts from the Executive Summary of the DP, dated July 2009, are as follows at Page xiii: "This DP documents the plan of execution for decommissioning of the LLRBS. ... A site-specific risk assessment has been performed, and documented in this DP and is

3

used to derive cleanup criteria for each of the potential radionuclide containments. Some important inputs to the risk assessment include: 1) the radionuclides of concern and their mobility; 2) the volume of contaminated soil and concentration of contaminants (especially in the vadose zone, because a removal action should virtually eliminate the source term burials); 3) depth to groundwater; and 4) other physical parameters." ... <u>At Page xv</u>: "Based on data collected during the Characterization Survey, the DP has been updated. Characterization Survey activities were completed in March 2007. The Characterization Survey activities resulted in the remediation of four of 46 potential burial pits. Remediation of the remaining 42 pits is planned to be executed under this DP."

5.

At Page 36, Paragraph 5.0, "PLANNED DECOMMISSIONING ACTIVITIES", the DP stated: "Results of the 2006 WCS were used to estimate the volume of wastes remaining at the LLRBS." It then detailed the amounts of waste and their specific types.

6.

The Plaintiff developed its technical approach, schedule and pricing based on the Solicitation scope of work as outlined in the Performance Work Statement and the in-place waste as described in the Draft Decommissioning Plan, the Low-Lever Radiation Burial Site Final Analysis Survey Design Plan and the Draft Low Lever Radiation Burial Site Waste Characterization Survey published in July, 2008. The Solicitation directed that proposals were to be based on the DP and stated that a final Decommissioning Plan was to be issued by the Nuclear Regulatory Commission (NRC) upon approval of the draft DP, which was to occur prior to beginning work on the site.

7.

The contract was awarded to TES on 9 November, 2010. At the same time the contract was awarded, the Plaintiff received Modification DO 0001 which directed the Plaintiff to perform Task-1, which was the drafting of the Work Plan. The Plaintiff developed Work Plan Revision 0 based on the original PWS and the Draft DP in the Solicitation and which was a prerequisite to initiating work on the site. After receiving the DO 0001, the performance schedule was extended three times to 31 March, 2013, a total of eighteen (18) months, because the draft DP had not been approved by the NRC until December, 2012.

8.

The Plaintiff immediately began remediation effort after receiving DO 0003 in early April 2013, which authorized the start of remediation work. However, the Defendant issued a revised PWS on May 9, 2013, which required an additional soil erosion and sediment control plan. The Plaintiff completed these plans and submitted them in June, 2013.

9.

Immediately upon beginning work at the site the Plaintiff discovered that the DP was woefully incorrect and that the Performance Work Statement and Draft DP did not contain the correct information. From the first day of excavation it was revealed that the actual conditions at the site differed from that depicted in both the DP and the PWS.

10.

Generally, according to the DP and the PWS, there was a discrete number of burial pits at the site which contained specific hazardous wastes and which had been stored in a manner depicted by the DP. Initially, the DP stated that there was five (5) feet of undisturbed and

unsoiled earth on top of the burial pits. The first dig revealed that hazardous waste had migrated into the top layer of earth, thereby completely changing the Plaintiff's excavation plan.

11.

During the site excavation it was discovered that: (A) there were more burial pits containing hazardous waste than stated in the Solicitation which increased the amount and nature of the remediation work; (B) the distribution of the hazardous waste both horizontal and vertical was vastly different than that depicted in the Solicitation; and, (C) the nature and extent of the waste, both chemical and radiological, was different than that depicted in the Solicitation.

12.

For example: The Solicitation depicted discrete waste burial pits where the waste have been packaged and could be handled separately. The Plaintiff discovered that the waste had migrated both vertically into the allegedly clean overburden and through the earth walls that had separated the various burial pits. This, alone, caused a reevaluation of Plaintiff's remediation process and the amount and nature of the work to be performed. In addition, the Plaintiff discovered eight (8) additional waste pits that had not been shown in the DP or PWS which increased the amount and nature of the effort.

13.

The Solicitation depicted a waste known as "Liquid Scintillation Vials", or LSVs. These were glass ampules containing radioactive isotopes and hazardous organic fluids. This is considered to be a mixed waste type which is more difficult and expensive to handle. According to the Solicitation, only two pits contained the LSVs and the LSVs were supposed to be packaged which would make is easier to remediate. In reality, the Plaintiff found LSVs in thirty-

two (32) waste pits which increased the nature and expense of the remediation.

14.

The DP and the PWS also stated that the LSVs were either placed on vial trays and packaged in cardboard boxes or placed in plastic bags and then in cardboard boxes.. The Plaintiff found that they either had been just dumped into the pits or the packaging had broken down spilling the ampules all over the pit. The Plaintiff was forced to significantly increase staffing to address the high concentration of distributed LSVs

15.

The Plaintiff also discovered 32 instances of Radioactive Materials (RAMs) when it started the excavation that had not been depicted in the Solicitation . As these RAMs were in sealed and shielded configurations, they could not be safely opened and inspected at the site. Therefore, they had to be characterized as high levels of RAM or unstable/dispersible physical forms, neither of which were supposed to be at the site.

16.

The Plaintiff also discovered a new waste pit (Pit 52) with metal cylinders containing unknown gases in a Waste Cell that was not on the PD. Upon discovery the Plaintiff had to stop work until it could receive instruction from the Defendant. These cylinders took extra precautions, as their contents were unknown. They were finally removed, packaged and shipped off of the site.

17.

The original Work Plan by the Plaintiff had a Twenty-four (24) month base line schedule. This included an extremely time sensitive One Hundred and Twenty (120) day work schedule for

the remediation, packaging and transportation of the hazardous wastes. The original work was initially delayed by over Thirty (30) months awaiting the approval of the final Decommissioning Plan by the NRC. Once that was approved and the Plaintiff could start work, it was adversely impacted by the differing site conditions. The Plaintiff had planned to perform the work in the Summer and Fall months, however, the extra work so impacted the schedule that it extended into the Winter and the Plaintiff had to demobilize off of the site as no work could be performed in the Winter. The schedule impact increased the work from the planned one hundred and twenty 120 days to Two Hundred and Ninety-three (293) days and also impacted productivity, efficiency and administration.

18.

The Contracting Officer fundamentally changed the contract structure beginning with Delivery Order 0002. The contract was solicited and awarded based on Task 1, 2, 8 and 9 as Firm Fixed Priced tasks (FFP). Tasks 3, 4, 5, 6 and 7 was awarded as Fixed Unit Rates (FUR). The Solicitation had asked for a fully burdened FUR per cubic yard (CY) including all costs associated with performing the work for these tasks. DO 0002 added a Task for Public Meeting Support and priced it as a FFP. This was the first contract administration evidence of a unilateral contract change and an addition of scope of work not included in the solicitation. DO 0003 was then issued as FFP which constituted a unilateral change in the contract form. These actions by the contracting officer have both constructively and effectively changed the IDIQ contract from a solicited and awarded contract form of both FFP and FUR (T&M) to that of a purely FFP form.

19.

It is also the contention of the Plaintiff that it was required to execute contract

modifications under duress. The ACC-RI Contracting Officer withheld approval of the Plaintiff's Work Plan Revision 2 (WP Rev 2) unless the Plaintiff acceded to its demands concerning unresolved invoicing issues unrelated to the WP Rev 2. This caused a delay in project execution, to the point that compliance with the required ninety (90) day Resource Conservation and Recovery Act (RCRA) storage limit would be exceeded, resulting ia a notice of violation for the U.S. Department of Agriculture, and damages assessed against the Plaintiff. The Plaintiff was forced to accede to the contracting officer's demands which resulted in the adjustment of all previously submitted invoices to credit to the Government of over $900,000 while seeking further resolution of the dispute. In addition, the CO required that Plaintiff sign a waiver of rights to any Request for Equitable Adjustment for this issue before the CO would execute any approved modification to incorporate the WP Rev 2 into the contract.

## II. JURISDICTION

20.

On 11 August, 2015, the Plaintiff submitted to the Defendant a Request For Equitable Adjustment (REA) for an adjustment to the contract based on several legal theories. This was the culmination of a long series of discussions with the contracting officer concerning the Plaintiff's assertions that it had suffered large losses under the contract due to Government actions. The REA consisted of nine (9) three-ring binders of material. Is therefore obvious that there was a "dispute" between the Plaintiff and the Defendant as to the subjects of the REA.

21.

According to applicable case law, a "claim" means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum

9

certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract. The first determination to be made is whether the request is routine or nonroutine. Routine requests for payment, such as monthly invoices, request for progress payments, etc, do not become "claims" merely from their filing. Nonroutine requests for payment are considered to be "claims" even though they do not specifically state that they are claims. Examples of nonroutine requests are requests for equitable adjustment (*James M. Ellett Constr. Co. V. United States, 93 F.3d 1537, 1542 (Fed. Cr. 1996)* and submissions asserting a breach of contract (*Kentucky Bridge & Dam, Inc. V. United States, 42 Fed. Cl. 501, 519 (1998)*. It is obvious that the Plaintiff's Request For Equitable Adjustment, based on differing site conditions, among other reasons, is a nonroutine request for payment and, therefore, qualifies as a "claim".

22.

To be considered a CDA claim, TES' REA must have, either explicitly or implicitly, requested a contracting officer's final decision. (*Sam Gray Enters. V. United States. 32 Fed. Cl. 526, 529 (1995)* TES did not explicitly request a contracting officer's final decision with its original submission on 11 August, 2015, however, in a communication dated 21 October, 2015, TES specifically requested a final decision from the contracting officer. However, it has been ruled that "as long as the basic requirements of the CDA are met, and the contracting officer knows the bases of the claims and the final amounts sought, the 'request' for a final decision may be inferred from the circumstances of the case." (*Mega Constr. Co. V. United States, 29 Fed. Cl. 396, 443 (1993); Scan-Tech Sec., L.P. v. United States, 46 Fed. Cl. (2000))*. It is contended by TES that, as all of the conditions required were met, a request for contracting officer's Final Decision could be inferred from the REA submitted by TES and the time for the submission of a

10

Contracting Officer's Final Decision should be calculated from the 11 August, 2015, filing date..

23.

As to the certification of the Plaintiff's claim: An exact recitation of the CDA's boilerplate certification language is not required. (*Fischbach & Moore Int'l Corp v. Christopher, 987 F.2d 759, 763 (Fed. Cir. 1996)*) In fact, the Contract Disputes Act provides that "a defect n the certification of a claim shall not deprive a court or an agency board of contract appeals of jurisdiction over that claim" (*41 U.S.C. §7103(b)*. A review of the certification attached to the REA submitted by TES, indicates that it was signed by an individual authorized to sign for the company and contained the required language that the claim is made in good faith and that the supporting data is accurate and complete. The only language that may be lacking is that "the amount requested reflects the amount to which the contract is entitled". This, however, would constitute only an amendable defect in the certification and would not serve to deprive a Court of its jurisdiction to consider the claim. (*Gulf Group Gen. Enters. Co. W.L.L. v. United States, 114 Fed. Cl. 258 (2 July, 2013); CSX Transp. Inc. V. United States, 2015 U.S. Claims Lexis 1215, (18 Sept., 2015)*. That defect was cured on 9 December, 2015, when the same certifying official forwarded a new certification containing the missing language.

24.

Despite repeated efforts and requests to the Contracting Officer to respond to the Plaintiff's REA, no response, or Final Decision has been forthcoming. The CO has now had the REA it its possession for over four (4) months with no apparent action on its part. Therefore, the Plaintiff hereby appeals the lack of action on the part of the contracting officer based on a "deemed denial" of the Plaintiff's REA/Claim. The Plaintiff contends that this Court has acquired

jurisdiction over the Plaintiff's Appeal.

### III. THEORIES OF RECOVERY

### COUNT ONE: DEFECTIVE SPECIFICATIONS

25.

As the Request For Equitable Adjustment details: the placement of the wastes material; the amounts of various waste material; the identity of the various waste materials; and, the condition of the burial site, were completely different than that depicted in the solicitation documents. While it will not be repeated here, the entire work plan of TES was disrupted, as detailed elsewhere. TES was forced to: take longer to perform the work; change its recovery and disposal plan; dispose of much more material than planned; and, change its staffing plans and procedures.

26.

It has been a basic rule in Federal Government contracting for over One Hundred (100) Years that when a Government Agency advertises a solicitation for bidding, it warrants, or guarantees, that the technical directions contained in the solicitation are reasonably correct and that the offeror can rely on them to plan its work and calculate its pricing. The decision usually cited for this rule is *United States v. Spearin, 248 U.S. 132 (1918)*, however the United States Supreme Court cited other, older cases from its ruling. (*See Hollerbach v. United States, 233 U.S. 165; United States v. Utah &c. Stage Co., 199 U.S. 414, 424*)

27.

As stated in more recent cases, a plaintiff must allege and prove (1) that a valid warranty existed, (2) the warranty was breached, and (3) that the plaintiff suffered harm caused by the

12

breach. (*Hercules, Inc. V. United States, 24 F.3d 188, 197 (Fed Cir. 1994; Lakeshore Engineering Services, Inc. V. United States, 748 F.2d 1341, (Fed. Cir. 2014)* The *Spearin* doctrine recognized that when a contractual requirement binds the contractor to follow design specifications stated in the contract an implied warranty arises that the work based on the specifications will not be defective or unsafe. (*Essex Electro Eng'rs, Inc. V. Danzig, 224 F.2d 1283 (Fed. Cir. 2000)*

28.

Although the implied warranty situation normally arises when the contract specifications required detailed performance and ultimately prove to be incorrect, the nature of the technical information contained in the solicitation and utilized by the offerors to dictate their technical proposal and subsequent performance provides an analogous situation. The performance of TES was originally dictated by the information contained in the solicitation, until it was discovered to be incorrect and a new, more costly performance was dictated.

## **COUNT TWO: DIFFERING SITE CONDITIONS**

29.

Another, and perhaps easier, theory of recovery is the utilization of contract provisions established specifically for this purpose. The contract incorporates the provision of FAR 52.236-2, "Differing Site Conditions". This clause provides for an equitable adjustment in the time to perform or the cost to perform if caused by conditions at the site that differ materially from the contract documents. There is no question that the conditions at the burial site differed materially from those depicted in the engineering reports contained in the solicitation. Therefore, TES is entitled to an extension of time of performance and an increase in the contract pricing for any

increases in either attributable to the differing site conditions.

## **COUNT THREE: SUPERIOR KNOWLEDGE**

30.

The position of TES is bolstered by the theory of "superior knowledge." This is a narrow exception to the rule that in a fixed price contract, the bidder assumes all of the risks of non-performance. In order to establish a claim for superior knowledge, the contractor must establish that: (1) the contractor undertook to perform without knowledge of a fact (or facts) that affects performance costs or direction; (2) the government was aware the contractor had no knowledge of and no reason to obtain such information; (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and. (4) the government failed to provide the relevant information. (*Helene Curtis Indus., Inc. V. United States, 160 Ct. Cl. 437, 312 F.2d 774 (1963); GAK Corp. V. United States, 932 F.2d 947 (Fed. Cir. 1991); P&K Contracting, Inc. V. United States, 108 Fed. Cl. 380 (2012).*

31.

There is a volume of evidence to establish that the Government either knew, or should have known, of the actual condition of the burial sites and that they did not conform to the descriptions in the engineering reports. There were three engineering surveys, the last being in 2014. It is apparent when the actual conditions found by TES are compared with the conditions described in the 2009 Survey, either findings were ignored or the survey was not performed in accordance with professional standards. Simple digging the surface with a shovel would have revealed that the buried material had migrated upward into the alleged unadulterated cover earth. Either the Agency or its contracted experts had, or should have had, the knowledge that would

have allowed TES to properly bid the contract and forestall the problems encountered.

**COUNT FOUR: CONSTRUCTIVE CHANGES**

32.

FAR 52-243-1, "CHANGES-FIXED PRICE –ALTERNATE I", also provides relief in this instance. This clause allows the contracting officer to make changes to the contract, to include description of the services to be performed. The discovery of the difference in the amount, condition, and placement of the materials to be excavated and remediated would be considered a "constructive change". This is a situation where a contractor is required to perform work beyond that covered by the contract and such work is either ordered or caused by Government actions. In most cases it results from a difference in the interpretation of the specifications or in performing to defective specifications

33.

In all of the cases of a constructive change the basic principle is that the costs of this type of constructive change include all costs incurred from the inception of the contract in attempting to cope with the defective specifications, or misinterpretation. In our situation this would include all costs incurred in locating, identifying, removing and remediating the buried material over and above that planned based on the defective engineering reports.

**COUNT FIVE:      HINDRANCE OF PERFORMANCE OR FAILURE TO COOPERATE**

34.

As has been stated: "Government contracting agencies have a general obligation, implied in law, to cooperate with their contractors and not to administer the contract in a manner which

hinders, delays or increases the contractor's cost of performance." (*CRF, ASBCA 18748, 76-2 BCA ¶12,129 (1976); Malone v. United States, 849 F. 2d 1441, Fed. Cir., 1988; Metcalf Construction Company, Inc. V. United States, 742 F. 3d 984 Fed. Cir., 2014*) Many situations can give rise to a violation of the duty to cooperate, which include: failure to prevent one contractor from hinder the performance of another; failure to allow access to the job site; unreasonable exercise of the Government's discretion in administering the contract or delay or refusal to approve/disapprove discretionary action; overzealous inspection; or, any other acts which exceed contract requirements or adversely affect the contractor's performance.

35.

It is the contention of the Plaintiff that the Contracting Officer failed in its duty to cooperate with the Plaintiff in the performance of this contract and, in some instances, actively interfered with the performance. Actions such as refusing to sign modifications, requiring the Plaintiff to acquiesce to the CO's demands under duress, delays in communication, and failures to coordinate with other Governmental organizations, delayed the performance of the contract and increased the Plaintiff's cost to perform.

## COUNT SIX: GOVERNMENT DELAY IN PERFORMANCE

36.

As stated above, and in the Plaintiff's REA, direct and indirect Government actions delayed performance of the project and exacerbated the Plaintiff's costs. This started with the inability of the Government to procure approval of the Draft Decommissioning Plan from the NRC. This initially delayed the beginning of performance for over two (2) years. While a modification has been negotiated reimbursing the Plaintiff for delay costs associated with this

16

delay, the delay in beginning performance placed the Plaintiff in to an entirely new performance period.

37.

The initial delay and the discovery of the differing site conditions placed the Plaintiff into a Winter performance period and dictated the shutdown of the project for almost six (6) months. Another two (2) month delay was suffered because of the administrative problems with the CO. All of these clearly forced the Plaintiff into a more costly contract performance.

### IV. DEMAND FOR COSTS

38.

Pursuant to the above, the Plaintiff requests recovery of the following amounts:

A.  Added costs for two additional revisions of the WP, TMP and WTMP:

    Not less than the sum of: Ninety-two Thousand, Four Hundred and Eighty Dollars and Twenty-five Cents. (**$92,480.25**)

B.  Added costs for the extended duration of the originally estimated Mobilization/Demobilization, and costs for two additional pairs of Mobilization/Demobilizations not in the original estimate:

    Not less than the sum of : Three Hundred and Ninety-five Thousand, Seven Hundred and Fifty Dollars and Eleven Cents (**$395,750.11**)

C.  Site Remediation: Added costs for the duration of the originally estimated site remediation, and additional costs for equipment left on site during the Winter delay. Not less than the sun of: Three Million, One Hundred and Eighty-seven Thousand, Two Hundred and Two Dollars and Ninety-eight Cents

**($3,187,292.98).**

D. Site Sampling: Added costs for the duration of the originally estimated site remediation, and additional costs for equipment left on site during the Winter delay. Not less than the sum of: Three Hundred and Eighty Thousand, Four Hundred and Twenty-one Dollars and No Cents **($380, 421.00)**

E. Packaging and Staging: Additional waste quantities and disputed portion of the FFP CLIN. Not less than the sum of: Four hundred and Five Thousand, One Hundred and Ninety-four Dollars and No Cents **($405,194.00)**

F. Transportation: Additional waste quantities and disputed portion of the FFP CLIN. Not less than the sum of: One Million, Six Hundred and Seventy-four Thousand, Four Hundred and Seventy-three Dollars and Twenty-six Cents **($1,674, 473.26).**

G. Treatment and Disposal: Additional waste quantities and disputed portion of the FFP CLIN. Not less than the sum of: One Million, Twenty-four Thousand, Four Hundred and Thirty-four Dollars and Fifty-six Cents **($1,024,434.56)**

H. All costs, including attorney's fees expended by the Plaintiff in formulating, drafting and presenting its Request for Equitable Adjustment to the Defendant. But not less than the sum of: One Hundred and Fifty Thousand Dollars **($150,000.00)**

## V. CONCLUSION

The Plaintiff respectfully requests this Court to accept jurisdiction over this Appeal, order the Contracting Officer to issue a Final Decision without delay and direct the United States file and Answer to the Plaintiff's Complaint. After conducting a trial on the issues and a verdict in favor of the Plaintiff, the Plaintiff respectfully requests this Court to award the Plaintiff all costs

requested above and proven to this Court.

**WHEREFORE**, THE Plaintiff respectfully this Court to find in favor of the Plaintiff and to award to the Plaintiff the amounts reflected in Section IV, above, of the Plaintiff's Complaint.

Submitted, this the 22nd day of December, 2015.

Respectfully Submitted;
J. HATCHER GRAHAM, P.C.

_____
J. Hatcher Graham
Georgia Bar No. 304577

303 Pheasant Ridge
Warner Robins
Georgia      31088
Office: (478) 953-5606
Fax:    (478) 953-0272
govlaw@hatcherlaw.mgacoxmail.com